Martin and Wife et al. vs. Campbell, Ad., etc.

---

## MARTIN AND WIFE et al. vs. CAMPBELL, Ad., etc.

1. ADMINISTRATION: *Settlements in equity: Statute of limitation.*
   In suits in equity against administrators for an account and settlement, when the relief sought is purely equitable and not cognizable at law, courts of equity may and should refuse to entertain stale and antiquated demands, though not barred by any statute of limitations.

2. ADMINISTRATOR: *Allowance to in equity for support of infant heirs.*
   An administrator, *stricti juris,* has no right to make expenditures out of the assets of the estate for the education and support of children of the intestate; but in a suit in equity by the heirs against him for an account, after a great lapse of time, the Chancellor may exercise a discretion in allowing them, upon a view of all the equities of the case, if they were reasonable, made in good faith and suitable to the condition and circumstances of the children.

APPEAL from *Woodruff* Circuit Court in Chancery.
Hon. J. N. CYPERT, Circuit Judge.
*Coody*, for appellant.
*B. D. Turner, contra.*

EAKIN, J.  James F. Sasser died in Fayette county, Tennessee, in August, 1850, leaving some personal property, including two slaves.  His family consisted of a widow, who died in 1858, and five children, two of whom died childless.  The others, complainants in this case, claim, and are conceded, to be entitled to the property of the

estate. The debts were small and have been paid. Administration on his estate was granted, in said county, to Samuel B. Martin, his wife's father, who took the family under his charge, made and reported to the court a sale of the personal property, and, in April, 1854, filed a settlement, which seems, from the record, to have been intended as a final one. It included the hire of the slaves during that year.

In 1856 said Samuel B. moved to Jackson (now Woodruff) county, in this state, bringing with him the slaves and family of the deceased. He died there, testate, in the year 1870, and the defendant, Campbell, is his proper administrator, with the will annexed.

No further settlement of the affairs of the estate of Sasser seems to have been required of him during his lifetime. After his death, his son, complainant, James M. Martin, who had married a daughter of Sasser by a former wife, presented an account against the estate of said Samuel B., his father, in favor of his wife and the other complainants, for effects of Sasser's estate which said Samuel B. had failed to account for or pay over. This being disallowed, the said James M. and his wife, together with the other children of Sasser, filed this bill, alleging:

That said Sasser had left personal property which came to the hands of the administrator, said Samuel B., of the value of $3,200, and also $942 in money; for a large portion of which he had fraudulently failed to account; but had removed it from Tennessee, without any order of the court, and whilst the children had no guardian; and that he had received, also, and had failed to account for, the hire of the slaves from 1855 inclusive till their emancipation on the sixteenth of March, 1864, valued at $2,983. The bill prays for an account, and other fit relief.

The administrator of Samuel B. answered: denying that Sasser left more property than was shown in the sale's bill and accounted for in the settlement, save that turned over to the widow. He exhibits the receipts of said James M. and of the widow for their share of the estate of Sasser, coming to them out of the balance found in the hands of the said Samuel B. by the Jackson court in the settlement of 1854, the whole balance being $345.29. He admits the liability for hire during the years 1855 and 1856, when he says the slaves were turned over to the guardian of the minor children; and he files an account of the receipts and expenditures since the settlement, including said balarce, by which it appears that the estate, or distributees of Sasser, would be indebted to the estate of Samuel B. in a sum of $429.64.

The cause was heard upon the pleadings and evidence, and an account was ordered to be taken, by a special Master, of the management of Sasser's estate by his administrator. His directions were to take into the account and charge the balance of $345.29 found in the administrator's hands by the Tennessee settlement, and the hire of the slaves, commencing with the year 1855 and running to the time when said Samuel B. Martin delivered them over to the guardian of the children, and to charge interest from the time of the settlement, and from the time when the hiring moneys became respectively due. For the purpose of adjusting the account, he was directed to use the evidence in the case, and such other as the parties might adduce; and to give credit for such sums of money as may have been turned over; and necessary expenses incurred in taking care of the children.

The Master stated, and returned an account, showing a balance in favor of the estate of Samuel B. Martin of

$102.07, finding as a fact that he had turned over in his lifetime (on the sixteenth of February, 1859,) to the guardian of the Sasser heirs, after accounting for the hire of slaves, that amount of assets, in excess of what is due. Upon exceptions, the court corrected the account, diminishing this balance by the amount of $12.27, overruling the exceptions as to all else. The suit was dismissed with costs against complainants, from which they appealed.

Leaving out of view, as not within the province of jurisprudence, all which may shock the sentiment in this case, and considering it as a contest regarding the action of strangers in blood to each other, it appears from the evidence, and was evidently so considered by the Chancellor, that there was no actual fraud, or conversion of the effects of Sasser's estate by Samuel B. Martin. Without comment on the credibility of witnesses, it is enough to say, the proof does not sustain the allegations that more assets of any kind came into Samuel B. Martin's hands in Tennessee than were shown by his settlement, and does show that the allegation is untrue which charges him with having received the hire of the slaves from the year 1855 inclusive until their emancipation. For more than two years of that time, one of the two, and the most valuable of them, was in the hands of the son, who, if any one, is, himself, accountable to the other children of Sasser, his wife being one.

Sam'l B. Martin's administration was careless, and in some respects illegal, but evidently honest and well meant. The children, save his son's wife, were his grandchildren, and under his protection. His duty to them would have been orderly and regularly discharged by procuring for them the appointment of a guardian, and turning over to them the slaves, and the balance found due by the Tennessee set-

Martin and Wife et al. vs. Campbell, Ad., etc

tlement.   He did  pay over what was due of the  money to
his son's wife, and to Sasser's widow, but brought the slaves,
money, and  other  children  with  him  on  his  removal to
Arkansas.   This was illegal, so far as concerned the prop-
erty, and  upon  early  application  by  any  next  friend  or
guardian of the minors, he would have been held to a strict
accountability.

There is no  proof of other  property brought by him to
Arkansas.   Defendant  admits  his  liability  up  to  1859,
when the slaves and all the hire notes, which seem to have
been taken with care, were  turned  over to a guardian of
the minor children.   This, with  charges for removing the
family,  tuition,  provisions,  etc.,  with  his  commissions,
make the credit side of the account.

From  this time,  to the  presentation  of  the account
against defendant Campbell, a period of eleven or twelve
years,  at least, whilst all the parties were  in  the same
vicinity, no demand was made upon Samuel B. for a settle-
ment, nor was any complaint made of  his management.
There is no trace, indeed, of any dissatisfaction with him,
in his lifetime, nor any charge against him while he was in
existence to face it and defend himself.

In this aspect of the case the Chancellor might well have
dismissed it on the first hearing.   It was not barred by any
statute, but the relief sought was purely equitable.   In
such cases courts of equity are not bound by the limita-
tion acts, but consider staleness as an  equitable element in
determining  that discretion  to  give  or withhold  relief,
which originally governed every case.   When the demand
is not cognizable at law, courts of equity may, and should,
refuse to  entertain  stale and  antiquated demands.   This
applies with special force to family transactions, which in
general are not conducted by rigid rule; although it ap-

*[margin note:]* 1. ADMINIS-
TRATION:
Settle-
ments in
equity:
Statute of
limita-
tions:
Staleness
of demand.

Martin and Wife et al. vs. Campbell, Ad., etc.

plies, also, to all matters of account between strangers. Unless, says Mr. Story, there be peculiar circumstances justifying or excusing delay, " courts of equity refuse" (in matters of account) "to interfere after a considerable lapse of time, from considerations of public policy, from the difficulty of doing entire justice, when the original trans- actions have become obscure by time, and the evidence may be lost, and from the consciousness that the repose of titles and the security of property are mainly promoted by a full enforcement of the maxim, *'vigilantibus non dormien- tibus jura subveniunt.'*"   To these general considerations may, in this case, be added, that between the transactions complained of and the filing of the bill, a devastating and confusing civil war had swept over the land, destroying lives of witnesses, scattering written evidences, and sweep- ing away, or confusing, the recollections of men concerning petty events of the anterior time; and, more still, the man who knew most of all, and had the most interest in clear- ing up 'charges, was dead, without warning of such an at- tack upon his memory.

The defendant, however, might well enough agree to the reference, and he did not except to the order making it. It devolved upon the special Master to take the account in accordance with the directions.   Whether he has done so or not, is all we have to consider.   The exceptions will be considered *seriatim*.

The first is general; the second, third and fourth object that the Master failed to charge proper interest, and that he allowed a commission of 10 per cent. to the estate of Samuel B. upon the amount found due in Tennessee, and the hire of the slaves afterwards received.

We have no evidence of the law of Tennessee concerning commissions to administrators.   In our tribunals he might be allowed 10 per cent., and that seems equitable.

The Master commences the statement of the account with the balance of $310.77, as of date, May 31, 1854, charging interest thereon at the rate of 6 per cent. until October 21, 1855, and giving credit for the sums of $50 each paid the widow and James W. Martin, with like interest to the same date, striking a balance then of $232.53 to the debit of the administrator, and making a new point from which interest runs.

This was an error against the administrator. The settlement was not confirmed by the Fayette probate court until the March term, 1856, and interest should not have then commenced running at once. The administrator was entitled to a reasonable time to distribute the fund, if a distribution had been ordered, which was not. We do not know how long the court sat, and, therefore, can fix no time precisely, but the harshest measure against the administrator should not have included interest before April 1, 1856. Before that and after filing the settlement, he had paid out $100, reducing the balance to $210.77, to bear interest from the last mentioned date. Instead, though, the Master found a balance of $232.53, bearing interest from October 1, 1855. The hire of the slaves, less commissions, is charged in the account with interest. This was correct.

Fifth and sixth, that he allowed a credit to Samuel B. Martin of notes, accounts and currency, with interest, turned over by him to the guardian of the children. This was done thirteen years before suit brought. There had been no complaint meanwhile, nor is there now presented any evidence of fraud, or misconduct in the transaction. That a great portion of these assets could not be collected after the war, is well enough explained by the state of the country, of which this court has several times taken judicial cognizance. The assets, with accrued interest, should have been credited as they were.

The seventh and twelfth are general, not pointing out errors.

The tenth and eleventh regard evidence excepted to, and are not well taken.

The eighth seeks to go behind the Tennessee settlement, and is not sustained by weight of evidence as to property received and not accounted for.

The ninth objects to the allowance to the estate of Martin of sums expended in the removal of the family to Arkansas, and in furnishing provisions, education, etc.

The administrator, *stricti juris*, had no right to make these expenditures without the order or sanction of some competent court. They were reasonable, however; made in good faith, and were suitable to the condition and circumstances of the children. Samuel B. Martin was their grandfather and protector. They had no guardian. It doubtless was best for them that they should be brought to Arkansas with him when he removed, and the provisions and tuition were strictly necessaries. In holding him to an account, after so long a time, the Chancellor might exercise a discretion in allowing these items upon a view of all the equities of the case.

We find no substantial error in the record.

Affirm.